**LEAGUE OF WOMEN VOTERS OF UNITED STATES, a District of Columbia Corporation**

*v.*

**UNITED STATES.**

No. 232–56.

United States Court of Claims.
Jan. 20, 1960.

Albert E. Arent, Washington, D. C., for plaintiff. Francis J. Robinson, and Berge, Fox & Arent, Washington, D. C., were on the briefs.

Lyle M. Turner, Washington, D. C., with whom was Acting Asst. Atty. Gen., Howard A. Heffron, for defendant. James P. Garland and William T. Kane, Washington, D. C., were on the brief.

MADDEN, Judge.

This is a suit by the plaintiff League of Women Voters for the refund of estate taxes. The League was the residuary legatee under the will of Ann Webster, a resident of New Mexico, who died in 1949. The total gross estate was $142,-014.22. The residue, after deducting the specific bequests, was $112,269.89. The estate was required to pay a Federal estate tax of $11,913.70, all of which was paid out of the residue of $112,269.-89 and therefore reduced the gift to the League by the amount of the tax.

The plaintiff says that the bequest to it should have been allowed as a deduction from the gross estate, for estate tax purposes. If such a deduction had been allowed, no estate tax would have been payable, and the plaintiff would have received $11,913.70 more than it did receive. The plaintiff relies upon section 812 of the Internal Revenue Code of 1939, which says, so far as is here pertinent:

"§ 812. Net estate.

"For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate—

\* \* \* \* \* \*

"(d) *Transfers for public, charitable, and religious uses.*—The amount of all bequests, legacies, devises, or transfers, \* \* \* to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art

and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, \* \* \*. 26 U.S.C. 1952 ed., § 812."

The plaintiff says that it is operated for educational purposes, and is therefore within the scope of section 812(d). The Government seems to dispute this contention, but we have no doubt about it, as will appear from our discussion. The real point in contest is with regard to the requirement of section 812(d) that no substantial part of the activities of the organization should be the carrying on of propaganda or otherwise attempting to influence legislation.

The plaintiff League is a non-profit organization. It was projected at the 1919 convention of the National American Woman Suffrage Association whose work for women's suffrage had by that time been completed by the adoption of the Nineteenth Amendment. The League had its first convention in 1920. It was then an affiliation of state leagues. In 1923 it was incorporated under the laws of the District of Columbia relating to non-profit, charitable, educational and religious corporations. Its principal office is in Washington, D. C. Its articles of incorporation provide:

"The business and objects of the corporation shall be to promote political responsibility through informed and active participation of citizens in government; to render such other services in the interest of education in citizenship as may be possible; and to do every act appropriate or necessary to carry out any of the foregoing objects.

"The corporation shall not support or oppose any political party or candidate."

Its by-laws provide:

"Sec. 1. *Purpose.*—The purpose of the League of Women Voters of

the United States shall be to promote political responsibility through informed and active participation of citizens in government.

"Sec. 2. *Policy.*—The League may take action on governmental measures and policies in the public interest. It shall not support or oppose any political party or candidate."

The League, in the tax year here in question, was made up of 709 local Leagues, and 35 state Leagues, all heading up in the national organization. Approximately 128,000 women were members of the League. Its organization and method of operation are described in great detail in our findings, and will be described only summarily in this opinion.

The League has developed a program system which is designed to limit the number of problems to be currently studied or acted upon by the League. The program is authorized by the League's biennial national convention. The individual members and their representatives make the program by discussing in their local League what they think the program should be, after which the local Leagues make recommendations to the national board of subjects for the program. State boards also submit recommendations. The national board meets some months before the convention and works out a "proposed program." It submits this proposed program to the local and state Leagues, which have six months to study and consider it, and may again submit recommendations. In the light of all this study, discussion and recommendation the national board presents a final proposed program to the convention. If the convention adopts it, which it usually does, it becomes the program of the League.

The program consists of the "current agenda", the topics on which the League believes it can be effective during the following two years, and the "platform" which comprises topics on which the League has taken a stand in the past and on which it proposes to hold its ground although these topics may not be currently in question.

After the national biennial convention of the League in 1949, the League's official publication made the following statement:

"The current agenda is made up of those governmental issues which the Convention has chosen for concerted action. Action may include (1) providing information, (2) building public opinion, (3) supporting legislation. It is the responsibility of the National Board of Directors to supply the membership with basic information on these items and to determine at a specific time the action that will be most effective in achieving the following goals:

"Current Agenda

"The League of Women Voters will work for United States policies directed toward an enduring world peace, supported by a strong United Nations and made possible by a sound domestic and world economy. To this end, League action will concentrate on:

"I. *Strengthening the United Nations through*—

"A. Support of the United Nations and its specialized agencies including their development through increased use, adequate budgets, and improved procedures under the present Charter.

"B. Use of all means available under the Charter to increase the security functions of the United Nations.

"C. A full information program on methods to strengthen the United Nations in order that it may better fulfill its stated purpose.

"II. *Promoting international reconstruction and the expansion of world trade.*

"III. *Analyzing federal taxes and expenditures in order to understand and support such fiscal policies as*

*make for a stable domestic economy.*"

The official League publication then went on to give a detailed explanation of the "Current Agenda." This explanation shows that it was the intention of the League to take vigorous action to achieve its goals. We see no way in which most of those goals could be achieved except by legislation by Congress, or by the United Nations, or by international treaties.

It was not the purpose of the League merely to make its members, or the public, intelligent about the problems of the United Nations and the expansion of its powers to enforce world security, or about the Marshall plan and international trade organizations and reciprocal trade. It was its purpose, through its membership and its officials, to do what it could to influence those who were in a position to bring about these results, if they could be persuaded to do so.

In an official League publication, entitled "A History of the League Program" published in 1949, appears the following:

League Program and League Purpose

"Sometimes the League of Women Voters is referred to as an "educational" organization which presents both sides of issues and leaves it up to the member to make up her mind. This is an incomplete description. Although the League does carefully consider a question from all points of view, it goes farther. It uses its own machinery of representative government to arrive at a position and take action on behalf of that position. This it considers necessary to the fulfillment of its purpose "to promote political responsibility through informed and active participation of citizens in government." Citizens do not assume responsibility without making decisions. The League was created to provide practice in making decisions."

As we have seen, one form of League action is that of supporting legislation.

This form of action may include a "Request for Action" to the state and local Leagues, setting forth the League's position on any pending legislation and requesting that each state and local League write letters or send telegrams to designated persons setting forth the League's position. For instance, a "Request for Action" was sent on May 17, 1949, urging action on five bills and the Atlantic Pact Treaty. Typical was the action urged with respect to the item "Removal of Margarine Taxes (H.R. 2023)", as follows:

"Already passed by the House and favorably reported by the Senate Committee, this measure runs the risk of being lost again in the rush of Senate business. Letters should go now to all Senators (and especially to Democratic leaders Barkley, Lucas and Myers) urging them (1) to do all they can to bring this bill to the Senate floor before the summer recess, and (2) to oppose the Wiley amendment which would prohibit the interstate shipment of colored oleo."

Communications are also sent advising the local Leagues concerning positions taken, such as the letter dated May 2, 1949, stating:

"This letter brings you word that the League of Women Voters supports United States ratification of the North Atlantic Pact. * * * A League representative will testify before the Senate Foreign Relations Committee on behalf of the Pact. You may expect a Request for Action when League action can be most helpful."

Our finding 22(g) lists twenty-two separate instances of direct communications from the national League or its officials to persons in positions of authority with regard to legislation. These instances occurred during the two-year period of action planned at the League's 1948 convention.

The activities of the state and local Leagues in connection with state and

local problems are carried on in much the same way, in their more limited areas, as are those of the League as a whole in connection with national problems.

The local Leagues carry on many activities which have no relation to influencing legislation. They sponsor meetings at which candidates of all parties, or proponents and opponents of measures present their arguments. They urge those eligible to vote to exercise their privilege. They sometimes distribute literature stating the arguments for and against positions and measures, but not taking a position on either side.

The plaintiff League urges that only an insignificant part of its energies and resources are devoted to efforts to influence legislation. It has presented an accounting, attributing the woman hours devoted to League activities to various classifications, and attributing very few such hours to efforts to influence legislation.

It seems to us that the hours spent by some 128,000 women in more than 700 local Leagues, deliberating and discussing what position, if any, should be taken on questions of public interest, are spent in preparation for the influencing of legislation. They are spent for the purpose of presenting a united front to legislative bodies in order to induce action or inaction. When agreement has been reached on a national scale and the League's convention has stated the League's program, it seems to us that all the action of all the women of the League from that time forward is taken for the purpose of influencing legislation. They are studying the League's literature, learning how to argue effectively for the League's position, readying themselves to respond to the "Request for Action" if it should come from their national officers.

It would seem to us that, instead of its being an unsubstantial and insignificant part of the League's activities, the influencing of legislation is the League's main purpose and reason for being. When the mantle of the National American Woman Suffrage Association descended upon it at its birth, it could hardly have thought of itself as an institution devoted to pure and purposeless research and self-education. As we have said, we have no doubt of the League's status as an educational organization. The education of public-spirited women so that they may, by their agreed opinion deliberately and intelligently arrived at, influence legislators or influence others to influence legislators to reach right decisions, is education of the most useful and laudable kind. But a gift to such an educational institution cannot qualify for a tax deduction under section 812.

The plaintiff's petition will be dismissed.

It is so ordered.

LARAMORE and WHITAKER, Judges, concur.

JONES, Chief Judge, dissenting, in which LITTLETON, Judge (Ret.) joins:

We are unable to agree that the substantial purpose of the League was "carrying on propaganda or otherwise attempting to influence legislation." Rather, we think its primary or almost exclusive purpose was that of enabling women to capably discharge the duties that the new voting privilege had placed upon them.

It is to their lasting credit that they did not take their new obligation lightly, but sought to prepare themselves to discharge this trust intelligently.

We believe the majority opinion fails to recognize the vast difference between attempting to promote general policies and principles of government that may be implemented by legislation or by other practices and customs that will inure to the benefit of all citizens and tend to promote sound government; and the drive or lobbying for legislation that has for its purpose the serving of the interests of a limited or selfish group. The one may or may not result in legislation. It may be a drive for a treaty, or it may be merely evidenced by a change in the habits, customs, and thoughts of a people, while the other has no such

over-all objective, but seeks to secure certain privileges for a limited group. We have not the slightest doubt it was the latter type which the Congress sought to put under the ban, and not those who seek to promote the principles of good government, and who seek no advantage to themselves that will not flow to all citizens.

Nearly all the legislation passed by the Congress recognizes this distinction. This is illustrated by antilobbying legislation.

Lobbying is defined in Black's Law Dictionary, 4th edition, page 1086, as follows:

> " 'Lobbying' is defined to be any personal solicitation of a member of a legislative body during a session thereof, by private interview, or letter or message, or other means and appliances not addressed solely to the judgment, to favor or oppose, or to vote for or against, any bill, resolution, report, or claim pending, or to be introduced by either branch thereof, by any person who misrepresents the nature of his interests in the matter to such member, or who is employed for a consideration by a person or corporation interested in the passage or defeat of such bill, resolution, report, or claim, for the purpose of procuring the passage or defeat thereof. But this does not include such services as drafting petitions, bills, or resolutions, attending to the taking of testimony, collecting facts, preparing arguments and memorials, and submitting them orally or in writing to a committee or member of the legislature, and other services of like character, intended to reach the reason of legislators."

Practically all the restraining legislation in matters of this kind has to do with representatives or concerns who are seeking to influence the passage of legislation that will be of direct financial interest to themselves or to the concern or association which they represent. Apparently there has never been any thought of restraining or limiting the activities of any organization that has for its primary purpose the dissemination of information that they believe will inure to the benefit of all of the people of the Nation.

An enlightened citizenship is the only hope of a free government. No country that is steeped in ignorance can either become or remain free. How can people retain their rights if they do not understand them? That requires continuous effort. Otherwise the country will sink back to dictatorship and despotism and individual rights will be lost.

Human freedom has involved a long struggle. Through despotisms, aristocracies and dictatorships, ambitious individuals and groups have sought to restrict the rights of men. Wars have been fought and many men and women have lost their lives in the struggle upward toward the plains of liberty. These wars have cost seas of blood, broken hearts, and billions of treasure. Our forefathers wrung from the hands of a foreign tyranny the unhindered right to be free.

But it is not enough to win liberty. It must be maintained by "eternal vigilance;" otherwise it will be lost. The only way a free people may remain free is through the exercise of the ballot—and then only if it is intelligently exercised. We grow used to the precious things of life and take them for granted. With all our boasted progress, not much more than half our citizens exercise the privilege of the franchise. Much needs to be done in arousing the interest of citizens in perpetuating the principles of free government and in protecting our heritage. Few organizations in our land have made it their primary business to arouse interest in voting and through research and open discussion promote not only the exercise of the ballot but its use in an understanding manner.

We cannot believe it was the intention of the Congress to deny an exemption to an otherwise qualifying organization merely because it seeks in some instances, in a wholly unselfish manner, to trans-

late principles of government into the form of legislation, when the organization will derive no special benefit from that legislation. The language does not require it, and certainly the interests of the Nation would not be served if this organization should cease to take an interest in public affairs.

One of our great universities prints on the flyleaf of its annual catalogue these words

"A cultivated mind is the guardian genius of Democracy. It is the only dictator that freemen acknowledge, and the only security which freemen desire."

To have an organized force with 700 local chapters in every part of this broad, big country that is devoted to stimulating an interest in the problems of government is a distinct national asset.

In our system of government worthwhile policies grow out of the customs and habits of the people in the various communities that make up our country. As a rule men do not make laws. They merely discover them. When in the course of progress the customs and habits of a people and sometimes their methods of doing business change, the wise legislator crystallizes these changes into law so that the conduct of all may be brought into line with the wishes of the majority, subject always to the limita-

tion of our Constitution and Bill of Rights. This is the essence of free government.

The operations of plaintiff organization follow this pattern completely. Its activities, ideals, and moral fibre grow out of the local chapters and local communities. It is like the limbs and roots of a tree. Without the life-giving flow of strength and vitality from these local chapters, the trunk of the tree would be nothing but dried up sap—and as such would wither and die.

Several cases have been decided in which local or State leagues have been held exempt. Liberty Nat. Bank & Trust Co. v. United States, D.C.W.D.Ky.1954, 122 F.Supp. 759, in which a number of cases are cited.[1]

The majority draws a distinction between the local chapters and the national organization, but as a matter of fact they are as intimately linked as the law of supply and demand; they are part and parcel of each other. The central organization is but the national arm of the local chapters. It is the channel or clearing house through which the local chapters receive information as to the pros and cons of principles and policies of government and to which they may after discussion convey their position. This information may be again referred to and exchanged with other local chapters before the position or wish of the various

---

1. The phrase "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation" first appeared in the Revenue Act of 1934, § 406, 26 U.S. C.A.Int.Rev.Acts, page 239. The bill which eventually evolved as that revenue act contained no such limitation as first introduced and passed by the House. It was added by the committee in the Senate being first placed in the section, 23(o) (2), dealing with deductions allowed individuals on contributions to charitable organizations. It was then placed in the estate tax section, where it now appears. The purpose in so doing was stated in the Senate Report as follows:

"This change is necessary to carry out the policy adopted in section 23(o) (2)." [Senate Report 558, p. 46, 73d Cong., 2d Sess.]

What was the policy intended by the placing of the limitation in section 23(o) (2)? The committee reports shed no light, but the discussion on the Senate floor when the amendment to the House bill was brought up indicates that organizations such as plaintiff were not to be removed from exemption. This discussion lends support to our belief that organizations such as those which act in the general interest of the public, for example those organizations urging adoption of the child labor amendment to which specific mention is made in the discussion as distinguished from those groups which advance the personal interest of the contributor, are not intended to be denied exemption. Cong.Rec. Vol. 78, Part 6, pp. 5861 and 5959.

chapters is finally determined. The record shows that more than 90 percent of the time of local chapters is taken up with matters of local and community interest. The record does not disclose a single one of the organizations—local, state, or national—seeking to influence legislation that would be of peculiar financial benefit to themselves.

Even if it were determined that the efforts of the organization to influence legislation were of the type intended to be put under the ban, our findings presented by the trial commissioner who saw the witnesses face to face and who went through the record, and whose findings we have adopted, rather clearly show that the legislative activities were not a substantial part of the League's activities. The seven primary activities of the organization are set out in findings 22 and 23, and in summarizing the hours spent in various types of activity the following percentage is shown:

|  | Hours | Percentage of Total |
|---|---|---|
| Organization | 65,758 | 46.28 |
| Finance | 14,383 | 10.14 |
| Administration | 19,150 | 13.50 |
| Public Relations | 11,092 | 7.82 |
| Program | 28,255 | 19.92 |
| Voters Service | 2,468 | 1.74 |
| Legislative | 737 | .52 |
| Total | 141,843 | [1] 99.92 |

1. Even if the first four of the above items are eliminated, leaving the three categories of program, voters service, and legislative activities, the percentage would be as follows:

|  | Hours | Percentage of Total |
|---|---|---|
| Program | 28,255 | 90 |
| Voters Service | 2,468 | 8 |
| Legislative | 737 | 2 |
| Total | 31,460 | 100 |

Subsequent findings show the amount of activities of the various local and state chapters and the percentage of time and effort devoted to legislation. The various activities of the League are disclosed in detail in the findings.

We are unable to escape the conclusion that the League of Women Voters is a completely unselfish organization operating almost exclusively in the public interest. It is clearly not the type of organization which the Congress meant to exclude from the benefits of the tax-exemption section. The activities of the League are in no sense partisan. It is almost wholly educational in its nature. It undertakes to present both sides of every issue to its various integral branch organizations, does not undertake to prejudice the issue but undertakes to reflect the sentiment of the various local bodies which have been reached after thorough consideration and discussion. A very small part of the activities of the organization as a whole is devoted to influencing legislation and none at all to influencing legislation that would inure solely to the benefit of the national organization and its integral chapters.

We would hold that the activities of the organization as a whole bring it within the exemption clauses of section 812(d) of the Internal Revenue Code of 1939, and that the plaintiff therefore is entitled to recover.